ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JAN 26 2005
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SWANSON GROUP, INC., | ) |
| Plaintiff, | ) |
| v. | ) No. 05-171C |
| THE UNITED STATES, | ) |
| Defendant. | ) |

**COMPLAINT**

**COUNT I**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609.

2. Plaintiff is Swanson Group, Inc. ("Swanson").

3. Swanson was formally known as Superior Lumber Co. ("Superior"), having officially changed to its current name on March 7, 2002.

4. Defendant is the United States of America acting through the United States Forest Service, Department of Agriculture (the "Forest Service").

5. This action arises out of the Forest Service's deemed denial of Swanson's claim under the Contract Disputes Act, 41 U.S.C. § 601 et seq. (the "CDA") for breach of the Forest Service's Whitecap timber sale contract, Contract No. 086931.

6. On July 12, 2004, Swanson submitted a properly certified claim letter to the contracting officer pursuant to the CDA, seeking the damages detailed herein and requesting a final decision within 60 days.

7. In a letter dated July 22, 2004, and sent to Steven Swanson (Swanson's President), Brenda L. Woodard (the "contracting officer") acknowledged that the Forest Service had received Swanson's claim, and indicated that she would render a decision within 60 days, which would be September 11, 2004.

8. In a letter dated September 1, 2004, and sent to Steven Swanson, the contracting officer notified Swanson that she would not issue a final decision by September 11, 2004, and would instead issue a final decision in an additional 60 days, which would be November 10, 2004.

9. In a letter dated November 3, 2004, and sent to Steven Swanson, the contracting officer notified Swanson that she would not issue a final decision by November 10, 2004, and would instead issue a final decision in yet an additional 60 days, which would be January 8, 2005.

10. In a letter dated January 3, 2005, the contracting officer notified Swanson that she would not issue a final decision by January 8, 2005 and would instead issue a final decision in yet another 60 days, which would be March 9, 2005.

11. The contracting officer has not made a good faith attempt to issue a final decision.

12. Because the contracting officer neither issued a final decision within 60 days, nor issued a final decision within the time in which she has informed Swanson on multiple occasions that she would issue a final decision, the contracting officer failed to satisfy her obligations under Section 605(c)(2) of the CDA, and, as a result, under Section 605(c)(5) of the CDA, the contracting officer is deemed to have denied Swanson's claim, allowing Swanson to bring a suit on the claim in this Court.

13. The Whitecap timber sale involves the sale and harvest of certain timber located in the Umpqua National Forest in Oregon.

14. On September 26, 1996, the National Marine Fisheries Service ("NMFS") issued a Biological Opinion addressing the potential impacts of Forest Service timber sales, including the Whitecap sale on the Umpqua River cutthroat trout. That Biological Opinion relied upon certain Biological Assessments prepared by the Forest Service. The NMFS concluded that these timber sales, including the Whitecap sale, would not "appreciably reduce the likelihood of survival and

recovery of Umpqua River cutthroat trout." Neither this Biological Opinion nor the Forest Service Biological Assessment substantiated this conclusion. Nevertheless, the Forest Service awarded the Whitecap sale to Swanson.

15. The Forest Service awarded the Whitecap timber sale contract to Swanson under Swanson's previous name (Superior) on October 31, 1996.

16. Swanson purchased the Whitecap sale as a source of supply for Swanson's timber mills. Swanson relied on the availability of the timber from that sale for that purpose.

17. Swanson began harvesting the Whitecap sale in November, 1997, continued removing timber from the sale through June of 1998, and then resumed operations in 1999, removing a total of approximately 1,300 thousand board feet (mbf) of lumber from the sale.

18. At all times relevant to this case, the Forest Service was obligated to ensure that its actions, including its sale of the Whitecap contract, did not violate the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, which provides that:

> Each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . .

19. Pursuant to the National Forest Management Act, 16 U.S.C. § 472 et seq., the Forest Service was required to comply with the "Northwest Forest Plan," the Aquatic Conservation Strategy ("ACS"), and the Land Management Plan for the Umpqua National Forest with respect to all of its actions concerning the Whitecap timber sale.

20. The Northwest Forest Plan was adopted by the Secretaries of Agriculture and Interior to address a variety of environmental issues within the range of the Northern spotted owl in the Pacific Northwest following the listing of that species under the ESA. The ACS was a component of the Northwest Forest Plan. The Northwest Forest Plan in 1994 amended the Land Management Plans of a number of National Forests, including the forest plan on the Umpqua National Forest which governed the Whitecap sale, such that those forest plans then included, among other things, the ACS.

21. In Pacific Coast Federation of Fishermen's Association v. National Marine Fisheries Service, No. 97-CV-775, 1998 WL 1988556 (W.D. Wash. 1998) ("PCFFA I"), a coalition of environmental groups challenged the sufficiency of certain Biological Opinions that had been issued by NMFS following consultation between NMFS and the Forest Service concerning the effects of Forest Service timber sales on certain aquatic species listed under the ESA.

22. The Forest Service was a named defendant in PCFFA I.[1]

23. In the Biological Opinions challenged in PCFFA I, NMFS had determined that if the Forest Service complied with the ACS, both at the broad landscape level of planning and when implementing site-specific agency actions such as timber sales, the Forest Service's actions would not violate the ESA by jeopardizing the continued existence of the listed species and, therefore in NMFS's opinion, could proceed.

24. In PCFFA I, the District Court, Judge Rothstein, held that if the Forest Service's timber sales complied with the ACS, then those sales would not violate the ESA. However, the Court found that the Biological Opinions were nevertheless invalid because the Opinions issued by NMFS, working in tandem with the Forest Service and relying on Forest Service Biological Assessments, failed to demonstrate that the individual timber sales were in compliance with the ACS. Accordingly, NMFS, and by necessary implication, the Forest Service, had not established that the timber sales at issue in PCFFA I complied with the ACS or the ESA.

25. On September 9, 1999, the NMFS issued another Biological Opinion addressing the potential impacts of certain Forest Service sales, including Whitecap, on aquatic species including the Umpqua River cutthroat trout and the Oregon Coast coho salmon, listed species

---

[1]The Bureau of Land Management ("BLM") was also a named defendant in PCFFA I and its timber sales and management plans were similarly subject to the ACS. However, the BLM's timber sales and management plans are not at issue in this action.

under the Endangered Species Act. The Biological Opinion relied upon a Biological Assessment prepared by the Forest Service. The NMFS Biological Opinion concluded that the timber sales in question, including the Whitecap sale, "are not likely to jeopardize the continued existence" of either the cutthroat trout or the coho salmon." This conclusion was not substantiated by either the Biological Opinion or the Biological Assessment.

26. In Pacific Coast Federation of Fishermen's Association v. NMFS, 71 F. Supp.2d 1063 (W.D. Wash., No. C99-67R, 1999) ("PCFFA II"), the same six plaintiffs from the PCFFA I case challenged additional Biological Opinions issued by NMFS as being inconsistent with ACS.

27. In PCFFA II, the plaintiffs argued that the biological opinions at issue were inadequate for the same reason that the ones at issue in PCFFA I were inadequate, i.e., the Biological Opinions did not adequately ensure or verify that the Forest Service or BLM had complied or would comply with ACS on these projects. On September 30, 1999, Judge Rothstein granted the plaintiffs' motion for summary judgment in PCFFA II.

28. While the appeal of PCFFA II was pending at the Ninth Circuit, the same six plaintiffs filed Pacific Coast Federation of Fishermen's Association v. NMFS, Case No. C00-1757R ("PCFFA III"), challenging NMFS for failing to ascertain ACS's compliance with respect to 20 additional biological opinions on the same grounds raised in PCFFA II covering approximately 170 timber sales, including the Whitecap sale.

29. On December 7, 2000, Judge Rothstein granted the plaintiffs' motion for preliminary injunction in PCFFA III, finding that the plaintiffs had a strong likelihood of success on the merits, because the 20 biological opinions at issue in PCFFA III had been issued under the same consultation procedures used in PCFFA II, which the court had already determined were arbitrary and capricious because those procedures failed to ensure or verify agency compliance with ACS.

30. In accordance with the preliminary injunction in PCFFA III, NMFS suspended the 20 biological opinions at issue, including the biological opinion (dated September 9, 1999) that covered the Whitecap timber sale.

31. In a letter dated December 22, 2000, the Forest Service advised Swanson, under Swanson's previous name (Superior), that the Biological Opinion supporting the Whitecap sale was no longer in effect and that Swanson's operations on the Whitecap sale were suspended.

32. Following the Ninth Circuit's decision affirming the lower court's decision in PCFFA II, see Pacific Coast Federation of Fishermen's Association v. NMFS, 265 F.3d 1028 (9th Cir. 2001), NMFS permanently withdrew the 20 biological opinions at issue, including the Biological Opinion dated September 9, 1999 that covered the Whitecap timber sale. The Whitecap sale remained suspended by the Forest Service.

33. The Forest Service's suspension of the Whitecap sale remained in effect from December 22, 2000 until March 23, 2004 (except for a very brief period during which it was lifted temporarily during December 12-28, 2001).

34. Prior to award of the Whitecap timber sale to Swanson, the Forest Service knew or should have known that the Whitecap timber sale was not in compliance with the ACS and that neither the Forest Service's Biological Assessment nor the NMFS's Biological Opinion issued for the Whitecap sale prior to award demonstrated that operation of the Whitecap sale would be in compliance with the ESA or the ACS. By awarding the Whitecap timber sale and then subsequently suspending that sale in order to determine whether that sale complied with the ACS and the ESA, the Forest Service materially breached the Whitecap timber sale contract.

35. Because the Forest Service failed to design the Whitecap sale to ensure compliance with the ACS and the ESA, the Biological Opinion issued by NMFS did not and could not demonstrate that the Whitecap sale complied with the ACS and ESA requirements. The Forest Service therefore caused the suspension of the Whitecap sale and materially breached the contract.

36. Because the Forest Service failed to do the environmental analysis required in order to demonstrate that the Whitecap sale was consistent with the ACS and the ESA, the Biological Opinion covering the Whitecap sale was deemed invalid as a result of PCFFA II & III, and the

Whitecap sale had to be suspended by the Forest Service March 23, 2004. Thus, the Forest Service's failure to satisfy its obligation to ensure that the sale was consistent with the ACS and the ESA caused the suspension of the Whitecap sale and materially breached the contract.

37. Because the Forest Service worked in tandem with NMFS in developing the Biological Opinions that failed to demonstrate that the Whitecap sale complied with the ACS and the ESA, the Forest Service, as well as NMFS, was responsible for the invalidation of the Biological Opinions and the subsequent suspension of the Whitecap sale. Accordingly, the Forest Service materially breached the contract.

38. Prior to the award of the Whitecap timber sale to Swanson, the Forest Service knew or should have known that the NMFS's Biological Opinions and its own Biological Assessments were invalid and that no reasonable determination had been made that the operation of the Whitecap timber sale would be in compliance with the ACS or the ESA. By awarding the Whitecap timber sale and then subsequently suspending that sale in order to perform environmental analyses which should have been performed prior to award, the Forest Service materially breached the Whitecap timber sale contract.

39. Due to the Forest Service's material breaches of the Whitecap timber sale contract, Swanson was deprived of access to the Whitecap sale timber to supply its mills and has incurred damages in the total amount of $786,077.08.

**COUNT II**

40. Swanson incorporates and realleges herein paragraphs 1-39 of this complaint.

41. Additionally and in the alternative, pursuant to clause CT6.25 (1/93) of the Whitecap timber sale contract the Forest Service warranted that prior to award it had investigated the sale area and on the basis of its instructions and the Forest Service's knowledge at the time had included in the contract, identified on the sale area map, and otherwise identified on the ground, all measures adequate to protect the habitat of threatened, endangered and sensitive species. Clause C6.25 of the Whitecap timber sale contract indicates that at the time of award there were no areas requiring any such measures, and no such areas were identified to Swanson on the sale area map, elsewhere in the contract, or on the ground prior to the award of the contract.

42. Notwithstanding the Forest Service's warranty in clause CT6.25 (1/93) of the Whitecap timber sale contract, at the time of award the Forest Service had no valid basis for warranting that all measures adequate to protect the habitat of threatened, endangered and sensitive species had been included in the contract and identified to Swanson.

43. Because prior to awarding the Whitecap timber sale contract the Forest Service had not completed all necessary environmental analyses or properly consulted with NMFS as contemplated by clause CT6.25 (1/93), the Forest Service was required to suspend the Whitecap timber sale in order to accomplish these tasks.

44. Prior to the award of the Whitecap timber sale contract the Forest Service knew or should have known that it did not have a valid basis for its warranty under CT6.25 (1/93) of the Whitecap timber sale contract, and therefore the Forest Service's subsequent suspension of that contract in order to perform the required environmental analyses and consultation constituted a material breach of the contract.

45. The Forest Service's breach of its warranty under CT6.25 (1/93) of the Whitecap timber sale contract and the suspension of the contract which resulted from that material beach caused Swanson to incur damages in the amount of $786,077.08.

**COUNT III**

46. Swanson incorporates and realleges herein paragraphs 1-39 above.

47. The Forest Service's suspension of the Whitecap timber sale contract was imposed on December 22, 2000 and was in place for over three years, i.e., until March 23, 2004, with the exception of a brief lifting of the suspension outside the normal operating season on December 12, 2001, only to be followed by a reinstatement of the suspension on December 28, 2001.

48. The ostensible purpose of the suspension was to permit the Forest Service time to consult with NMFS concerning whether the Whitecap timber sale contract complied with the ACS and would not jeopardize the listed aquatic species. The length of the time involved in the

suspension for this purpose was unreasonable in duration, and the Forest Service failed to undertake reasonable efforts to complete the required consultation within a reasonable timeframe.

49. Accordingly, in the alternative to Counts I and II, the unreasonable duration of the Forest Service's suspension of the Whitecap timber sale contract constitutes a further material breach of that contract and resulted in Swanson incurring damages in the amount of $786,077.08.

**COUNT IV**

50. Swanson incorporates and realleges herein paragraphs 1-39 above.

51. Additionally and in the alternative, the Forest Service materially breached the Whitecap timber sale contract by failing to compensate Swanson as required by clause CT6.01 for Swanson's cost of maintaining bonds during the suspension and Swanson's costs of preparing its claim in the total amount of $4,909.69.

WHEREFORE, plaintiff respectfully requests that this Court:

(a) rule that the Forest Service breached the Whitecap timber sale contract by wrongfully suspending the Whitecap timber sale;

(b) overturn the Contracting Officer's denial of plaintiff's claim;

(c) award plaintiff all the damages it has suffered as a result of the Forest Service's wrongful suspension of the Whitecap timber sale, plus applicable interest in accordance with the Contract Disputes Act;

(d) in the alternative, award Swanson all the compensation due to it under contract clause C6.01;

(e) award plaintiff its costs and attorneys' fees incurred in pursuing this action; and

(f) grant plaintiff such further relief as this Court deems just and proper.

Respectfully submitted,

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Alan I. Saltman
Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: January 26, 2005