**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SWANSON GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-170C |
| | ) | consolidated with 05-171C |
| THE UNITED STATES, | ) | (Judge Smith) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**APPENDIX TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON <u>THE ISSUE OF LIABILITY IN CASE NO. 05-171C ("WHITECAP")</u>**

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 22, 2006

# INDEX TO PLAINTIFFS' APPENDIX

**Description** **P. App. Page**

Excerpts of "Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl," dated April 13, 1994 .......... 1

Excerpts of Public Law 104-19 (July 27, 1995) "Making emergency supplemental appropriations for additional disaster assistance, for anti-terrorism initiatives, for assistance in the recovery from the tragedy that occurred at Oklahoma City, and making rescissions for the fiscal year ending September 20, 1995, and for other purposes" .......... 22

Excerpts from House of Representatives Report 104-124 (May 16, 1995) (Conference Report) .......... 33

Letter, dated May 16, 1996, from Don Ostby, Forest Supervisor, Umpqua National Forest to "Interested Part[ies]" re: completed Environmental Analysis for the Whitecap Timber Sale .......... 36

Decision Notice and Finding of No Significant Impact for Whitecap Timber Sale, dated June 28, 1996 .......... 37

Oregon Natural Resources Council v. Thomas, 92 F.3d 792 (9th Cir. 1996) .......... 42

Advertisement for Whitecap National Forest Service Timber Sale .......... 50

Forest Service FS-2400-14 Bid Form for Advertised Timber, dated September 20, 1996, for Whitecap Timber Sale .......... 51

Letter, dated October 31, 1996, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., awarding Whitecap Timber Sale, Contract No. 086931 .......... 55

Timber Sale Auction Bid Record for Whitecap Timber Sale, dated October 23, 1996 .......... 58

Excerpts from Forest Service Timber Sale Contract No. 086931, "Whitecap Timber Sale" .......... 62

Pacific Coast Fed. of Fishermen's Ass'ns. v. Nat'l. Marine Fisheries Serv., Order Granting Plaintiff's Motion for Preliminary Injunction and Denying Defendant's Request for Stay, No. C00-1757R (W.D. Wash. Dec. 7, 2000) .......... 65

Memorandum, dated December 19, 2000, to Forest Supervisors, Northwest Forest Plan Forests from Harv Forsgren, Regional Forester, Pacific Northwest Region and Bradley E. Powell, Regional Forester, Pacific Southwest Region .......... 75

Excerpts from "Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories and Requests for Production" in Swanson Group, Inc. v. United States, Nos. 05-170C, 05-171C (Fed. Cl. Feb. 6, 2006) .......... 77

Letter, dated December 22, 2000, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., re: suspension covering Whitecap Timber Sale .......... 81

Letter, dated December 12, 2001, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., re: Whitecap timber sale no longer subject to court's injunction .......... 82

E-mail, dated December 17, 2001, from Margaret "Peggy" Kain, Group Leader Forest Products and Vegetation, Pacific Northwest Region, to Karla K. Bird, et. al., re: "9th Circuit Stay of Judge Hogans [sic] Ruling" .......... 83

Letter, dated December 28, 2001, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., re: Whitecap timber sale "once again subject to the Court's injunction" .......... 84

Forwarded e-mail chain, last sent on March 9, 2004, from Greg Lesch, Planning and Products Staff Officer, Umpqua National Forest, to Brenda L. Woodard, re: "Alsea Valley Alliance (Oregon Coast coho listing case against NOAA): 9th Circuit dismisses ONRC's appeal for lack of jurisdiction;" including handwriting memorandum, initialed "BW" .......... 85

Letter, dated March, 23, 2004, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., allowing operations to proceed on Whitecap Timber Sale .......... 90

Letter, dated April 26, 2004, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., re: contract term adjustment pursuant to clause BT8.21 due to suspension under CT6.01 .......... 91

Letter, dated June 1, 2004, from Gordon Culbertson, VP Resources, Swanson Group, Inc. to Brenda Woodard, re: Swanson's view that suspension was breach of contract and its subsequent actions are made without prejudice to this view ........ 92

Certified Claim Letter, dated July 12, 2004, from Swanson Group, Inc. to Brenda Woodard, Contracting Officer ........ 93

United States
Department of
Agriculture

Forest Service

United States
Department of
the Interior

Bureau of Land
Management

April 1994

# Record of Decision

## for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl

# Standards and Guidelines

## for Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl



# RECORD OF DECISION

for

Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl

# RECORD OF DECISION

## for

## Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl

### Table of Contents


I. Summary . . . . . . . . . . 1

II. Introduction . . . . . . . . . . 2

III. Decision . . . . . . . . . . 4
- A. Statutory Basis for Ecosystem Management . . . . . . . . . . 5
- B. Land Allocations . . . . . . . . . . 6
- C. Standards and Guidelines . . . . . . . . . . 7
- D. Application of Decision . . . . . . . . . . 11
  - 1. Application to Land and Resource Management Plans . . . . . . . . . . 11
    - a. Bureau of Land Management
    - b. Forest Service
  - 2. Relationship of Standards and Guidelines to Existing Plans . . . . . 12
  - 3 Application to Timber Sales . . . . . . . . . . 13
  - 4. Application to other Contracts, Permits, and Special Use Authorizations . . . . . . . . . . 15
  - 5. Application to Research Activities . . . . . . . . . . 15
  - 6. Relationship to Other Plans and Proposals . . . . . . . . . . 15
  - 7. Relationship to Other Lands . . . . . . . . . . 16

IV. The Alternatives . . . . . . . . . . 17
- A. Alternatives Considered . . . . . . . . . . 17
- B. The Action Alternatives . . . . . . . . . . 19
- C. No-Action Alternative . . . . . . . . . . 24
- D. The Environmentally Preferable Alternative . . . . . . . . . . 25

V. The Selected Alternative . . . . . . . . . . 25

VI. Mitigation . . . . . 29
A. Mitigation Measures Adopted . . . . . 29
B. Mitigation Measures Not Adopted . . . . . 29
1. Vertebrates
2. Invertebrates and Plants

VII. Changes in Standards and Guidelines Between Final SEIS and Record of Decision . . . . . 34

VIII. Findings . . . . . 38
A. Court Injunctions . . . . . 38
B. Legal and Regulatory Compliance . . . . . 39
1. National Environmental Policy Act (NEPA) . . . . . 40
2. National Forest Management Act . . . . . 42
3. Federal Land Policy and Management Act . . . . . 48
4. Oregon and California Lands Act . . . . . 49
5. Endangered Species Act . . . . . 50
6. Coastal Zone Management Act . . . . . 51
7. Executive Order 11990 - Protection of Wetlands . . . . . 51
8. Clean Air Act . . . . . 51
9. Clean Water Act . . . . . 52
10. Federal Advisory Committee Act . . . . . 52

IX. Implementation . . . . . 53
A. Interagency Coordination . . . . . 53
B. Planning and Analysis . . . . . 54
C. Consultation and Coordination . . . . . 54
D. Protection of Tribal Treaty Rights and Trust Resources . . . . . 54
E. Initial Implementation of this Decision . . . . . 55
F. Fiscal Year 1994 Watershed Restoration Program . . . . . 57
G. Monitoring . . . . . 57
H. Authority to Amend or Modify this Decision . . . . . 58

X. Public Involvement . . . . . 58
A. Public Comments on the Draft SEIS . . . . . 59
B. Summary of the Comments Received . . . . . 60
C. Response to Comments on the Draft SEIS . . . . . 61
D. Response to Comments on the Final SEIS . . . . . 65

XI. Review and Approval . . . . . 73
A. Administrative Review . . . . . 73
B. Effective Date . . . . . 74
C. Administrative Record . . . . . 74
D. Signatures . . . . . 74

I. Summary

This Record of Decision is the culmination of an unprecedented effort in public land management. On April 2, 1993, President Clinton convened the Forest Conference in Portland, Oregon to address the human and environmental needs served by the federal forests of the Pacific northwest and northern California. The President, Vice-President and much of the Cabinet spent an entire day listening to all points of view and collecting information. The President then directed his Cabinet to craft a balanced, comprehensive and long-term policy for the management of over 24 million acres of public land. An interagency, interdisciplinary team of expert scientists, economists, sociologists and others was assembled -- the Forest Ecosystem Management Assessment Team led by Dr. Jack Ward Thomas. After three months of intensive work, which included the review of all fully-developed proposals for management of federal forests within the range of the northern spotted owl, the team produced a report assessing in detail ten options.

President Clinton announced his proposed "Forest Plan for a Sustainable Economy and a Sustainable Environment" on July 1, consisting of strategies for forest management, economic development, and agency coordination. The forest management and implementation portion of the strategy, which is the subject of this Record of Decision, was analyzed in a Draft Supplemental Environmental Impact Statement (Draft SEIS) issued in July that received over 100,000 public comments during a three month public comment period. A Final Supplemental Environmental Impact Statement (Final SEIS) was made available to the public in February 1994.

In this Record of Decision, we, the Secretary of Agriculture and the Secretary of the Interior, jointly amend the planning documents of nineteen National Forests and seven Bureau of Land Management Districts. This represents the first time that two of the largest federal land management agencies, the Bureau of Land Management and the Forest Service, have developed and adopted a common management approach to the lands they administer throughout an entire ecological region.

The management direction consists of extensive standards and guidelines, including land allocations, that comprise a comprehensive ecosystem management strategy. The strategy is based on Alternative 9 of the Final SEIS, except for minor modifications noted in this document or made in the attached standards and guidelines. The conservation measures included in this strategy are based upon the best available science and attempt to anticipate and forestall future

environmental problems, avoiding the severe economic dislocation and legal gridlock that occur when environmental problems are ignored.

There are more than 24 million acres of federal land in the planning area for our decision (defined as the range of the northern spotted owl). Approximately 30% of these acres have been set aside by Act of Congress. The remaining 70% is allocated by this management direction as: late-successional reserves (30%); adaptive management areas (6%); managed late-successional areas (1%); administratively withdrawn areas (6%); riparian reserves (11%); and matrix (16%). Standards and guidelines for each land allocation provide a coordinated ecosystem management approach to the planning area. Although certain thinning and salvage activities would be allowed in the reserves, programmed timber harvest would only occur in the 22% of the land designated as matrix or adaptive management areas, and only in compliance with standards and guidelines designed to achieve conservation objectives.

## II. Introduction

The controversy over the northern spotted owl and old-growth federal forests of the Pacific northwest has continued since the 1970s. At present there have been or are pending over a dozen lawsuits involving the northern spotted owl, marbled murrelet, and possible future timber harvesting in old growth. There are currently three separate court injunctions that have severely restricted new timber sale programs on federal forests in northern spotted owl habitat for the past three years.

The federal agencies most directly involved in the issues concerning the management of late-successional and old-growth forest within the range of the northern spotted owl are the U.S. Forest Service, Bureau of Land Management, National Park Service, Bureau of Indian Affairs, U.S. Fish and Wildlife Service, National Biological Survey, National Marine Fisheries Service and the Environmental Protection Agency. The five major federal laws that apply to federal land management in the planning area are the National Environmental Policy Act (NEPA), Endangered Species Act (ESA), National Forest Management Act (NFMA), Federal Land Policy and Management Act (FLPMA), and Oregon and California Lands Act (O&C Act).

President Clinton asked at the April 2, 1993, Forest Conference:

> How can we achieve a balanced and comprehensive policy that recognizes the importance of the forest and timber to the economy and jobs in this region, and how can we preserve our precious old-growth forests, which are part of our national heritage and that, once destroyed, can never be replaced?

The President set forth five principles to guide the federal interagency effort to develop a management strategy to protect the old-growth related species and produce a sustainable level of timber:

> First, we must never forget the human and the economic dimensions of these problems. Where sound management policies can preserve the health of forest lands, sales should go forward. Where this requirement cannot be met, we need to do our best to offer new economic opportunities for year-round, high-wage, high-skill jobs.
>
> Second, as we craft a plan, we need to protect the long-term health of our forests, our wildlife, and our waterways. They are a ... gift from God, and we hold them in trust for future generations.
>
> Third, our efforts must be, insofar as we are wise enough to know it, scientifically sound, ecologically credible, and legally responsible.
>
> Fourth, the plan should produce a predictable and sustainable level of timber sales and nontimber resources that will not degrade or destroy the environment.
>
> Fifth, to achieve these goals, we will do our best, as I said, to make the federal government work together and work for you. We may make mistakes but we will try to end the gridlock within the federal government and we will insist on collaboration not confrontation.

President Clinton summed up the Forest Conference:

> We're here to begin a process that will ensure that you will be able to work together in your communities for the good of your businesses, your jobs, and your natural environment. The process we [have begun] will not be easy. Its outcome cannot possibly make everyone happy. Perhaps it won't make anyone completely happy. But the worst thing we can do is nothing.

The land allocations and standards and guidelines that are adopted here satisfy all of the objectives set forth by the President. They comply with the requirements of federal law, including the five statutes listed above. They are based on the best available science and are ecologically sound. They will protect the long-term health of the federal forests. They will provide for a steady supply of timber sales and nontimber resources that can be sustained over the long term without

degrading the health of the forest or other environmental resources. Moreover, they involve a commitment by the federal agencies to work together.

This decision marks the turning point from formulation to implementation. Initial standards and guidelines have been developed, subjected to public comment, modified slightly, and adopted by this decision. The next step is to apply the standards and guidelines and adapt management of federal forests to sustain both the old-growth ecosystem and a supply of timber. In order to coordinate the activities of the various federal agencies that are involved, we have established an interagency structure that includes the Regional Interagency Executive Committee (RIEC), the Regional Ecosystem Office (REO), and provincial teams. These groups will oversee the necessary monitoring and research to continuously seek new information and understanding of the complexities involved in managing the old-growth and late-successional forest ecosystem in the Pacific northwest.

We view the action of adopting these standards and guidelines as a beginning and not an end of the process of resolving the issues that have developed during the controversy over federal forest management. We expect and welcome the continuing involvement of the public in the management of these valuable resources.

## III. Decision

In this Record of Decision, we jointly adopt Alternative 9 of the Final SEIS, as modified by this decision, and as amplified in the attachment to this Record of Decision entitled "Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl" (Attachment A). This decision, as spelled out in Attachment A (sometimes referred to herein as "the Standards and Guidelines"), is to be applied to lands administered by the USDA Forest Service and the USDI Bureau of Land Management within the range of the northern spotted owl, as provided in this Record of Decision. The following discussion explains the decision but is not intended to cover every aspect of the Standards and Guidelines, which set forth the management direction adopted by this decision in a single document and are intended to facilitate the agencies' implementation of our decision.

The Standards and Guidelines apply to the land allocations that are identified on the official maps of the Final SEIS, as corrected for minor mapping errors. These maps are stored electronically in the spatially unified database (SPUD) maintained by the interagency geographic information system (GIS) staff in the Regional Ecosystem Office at 333 S.W. First Avenue, Portland, Oregon 97204. Maps at 1/2-inch to the mile scale showing the land allocations are available for each Forest Service and BLM administrative unit at the respective unit offices.

## A. Statutory Basis For Ecosystem Management

In setting forth our mission to develop a strategy for management of federal old-growth and late-successional forests that we adopt today in this decision, the President charged us to use an ecosystem management approach. In this vein, we defined the planning area for this strategy as the federally administered lands within the range of the northern spotted owl. We asked our scientists to assess not only effects on individual species of each of the alternatives, but also the likelihood that the alternatives would provide for a functional and interconnected old-growth forest ecosystem. We involved all the relevant federal agencies at an early point in the planning process and asked them to coordinate their efforts to the extent possible.

Such an approach proceeds from our statutory authority as set forth in statutes such as the Forest Service Organic Act, the Multiple-Use Sustained-Yield Act, the Endangered Species Act, and the Federal Land Policy and Management Act. These statutes invest in our Departments broad discretion to rely upon our expertise to manage the lands under our administrative authority in a manner deemed to best meet the purposes Congress has delineated. One such purpose is to provide for the long-term sustainability of all of the forests' many natural resources, including the species that inhabit them. Through its utilization of ecosystem management principles, our decision is designed to meet this purpose more effectively and efficiently than previous planning efforts associated with management of federal old-growth forests. Statutes such as the Forest and Rangeland Renewable Resources Planning Act, the National Forest Management Act, and the Federal Land Policy and Management Act, which outline various procedures to follow in federal public land planning, also authorize the employment of principles intrinsic to ecosystem management. For example, they call for planning to be interdisciplinary, coordinated among agencies, and based on the best available science. The National Forest Management Act explicitly directs that diversity of plant and animal species be considered in planning. Moreover, the Endangered Species Act directs the Secretary of the Interior, and the Secretary of Agriculture with respect to National Forest System lands, to establish and implement a program to conserve fish, wildlife, and plants, including those listed as threatened or endangered. Thus, our decision, while emergent in some important respects, is nevertheless firmly grounded in the authority reflected in our statutory schemes as well as the best federal land management agency tradition of crafting approaches that meld dynamic concepts with the legal duties under which we are charged to carry out our stewardship responsibilities.

Finally, the National Environmental Policy Act, while not imposing substantive duties on the agencies, recognizes "the interrelations of all components of the natural environment," "the critical importance of restoring and maintaining

environmental quality," and "the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331. Further, the cumulative impacts analysis required under NEPA's regulations supports a planning approach that incorporates an ecosystem perspective.

### B. Land Allocations

This decision specifically incorporates seven land allocation categories, as set forth below. There is considerable overlap among some designated areas. For consistency and for acreage display purposes, lands subject to such overlaps are reflected in only one category, according to the order of land allocations in the following descriptions.

**Congressionally Reserved Areas** comprise 7,320,600 acres, representing 30% of the federal land within the range of the northern spotted owl. These lands have been reserved by act of Congress for specific land allocation purposes. This decision can not and does not alter any of these congressionally mandated land allocations. Included in this category are National Parks and Monuments, Wilderness Areas, Wild and Scenic Rivers, National Wildlife Refuges, Department of Defense lands, and other lands with congressional designations.

**Late Successional Reserves** comprise 7,430,800 acres, representing 30% of the federal land within the range of the northern spotted owl. These reserves, in combination with the other allocations and standards and guidelines, will maintain a functional, interactive, late-successional and old-growth forest ecosystem. They are designed to serve as habitat for late-successional and old-growth related species including the northern spotted owl.

**Adaptive Management Areas (AMAs)** comprise 1,521,800 acres, representing 6% of the federal land within the range of the northern spotted owl. These areas are designed to develop and test new management approaches to integrate and achieve ecological, economic, and other social and community objectives. The Forest Service and BLM will work with other organizations, government entities and private landowners in accomplishing those objectives. Each area has a different emphasis to its prescription, such as maximizing the amount of late-successional forests, improving riparian conditions through silvicultural treatments, and maintaining a predictable flow of harvestable timber and other forest products. A portion of the timber harvest will come from this land. There are ten adaptive management areas.

**Managed Late Successional Areas** currently comprise 102,200 acres, representing 1% of the federal land within the range of the northern spotted owl. These lands are either (1) mapped managed pair areas or (2) unmapped protection buffers.

Managed pair areas are delineated for known northern spotted owl activity centers. Protection buffers are designed to protect certain rare and locally endemic species.

**Administratively Withdrawn Areas** comprise 1,477,100 acres, representing 6% of the federal lands within the range of the northern spotted owl. Administratively withdrawn[1] areas are identified in current forest and district plans or draft plan preferred alternatives and include recreational and visual areas, back country, and other areas not scheduled for timber harvest.

**Riparian Reserves** initially comprise 2,627,500 acres, representing 11% of the federal lands within the range of the northern spotted owl (acreage subject to change following watershed analysis). The calculation of riparian reserve acreage is done after all other designated areas. As a result, the acreage shown reflects only that portion of riparian reserves that is interspersed throughout the matrix. Riparian reserves are areas along all streams, wetlands, ponds, lakes, and unstable or potentially unstable areas where the conservation of aquatic and riparian-dependent terrestrial resources receives primary emphasis. The main purpose of the reserves is to protect the health of the aquatic system and its dependent species; the reserves also provide incidental benefits to upland species. These reserves will help maintain and restore riparian structures and functions, benefit fish and riparian-dependent non-fish species, enhance habitat conservation for organisms dependent on the transition zone between upslope and riparian areas, improve travel and dispersal corridors for terrestrial animals and plants, and provide for greater connectivity of late-successional forest habitat.

**Matrix** comprises 3,975,300 acres, representing 16% of the federal land within the range of the northern spotted owl. The matrix is the federal land outside the six categories of designated areas set forth above. It is also the area in which most timber harvest and other silvicultural activities will be conducted. However, the matrix does contain non-forested areas as well as forested areas that may be technically unsuited for timber production.

### C. Standards and Guidelines

The detailed requirements that describe how land managers should treat the forest lands within the range of the northern spotted owl are described in Attachment A, particularly section C. Some standards and guidelines apply to all lands, others to a specific land allocation. More than one set of standards and guidelines may

---

[1] The term "withdrawn" does not mean a withdrawal for purposes of Section 204 of the Federal Land Policy Management Act.

apply in some areas -- for instance riparian reserve requirements within a late-successional reserve. In such cases, the more restrictive standards and guidelines generally apply. Some standards and guidelines contain an initial implementation strategy that may differ in some respects from the long-term strategy. The following summaries briefly describe the major standards and guidelines. For a more comprehensive description of requirements, see Section C of Attachment A.

Current Plans: Existing plans for national forests and BLM lands contain standards and guidelines for all activities, from road and trail construction to visitor information rules. Except as otherwise noted in this ROD or Attachment A, the standards and guidelines of existing plans (or draft plan preferred alternatives) apply where they are more restrictive or provide greater benefits to late-successional forest-related species than do other standards and guidelines in Attachment A.

Late-Successional Reserves: Late-successional reserves are to be managed to protect and enhance old-growth forest conditions. For each late-successional reserve (or group of small reserves) managers should prepare an assessment of existing conditions and appropriate activities. No programmed timber harvest is allowed inside the reserves. However, thinning or other silvicultural treatments inside these reserves may occur in stands up to 80 years of age if the treatments are beneficial to the creation and maintenance of late-successional forest conditions. In the reserves east of the Cascades and in Oregon and California Klamath Provinces, additional management activities are allowed to reduce risks of large-scale disturbance. Salvage guidelines are intended to prevent negative effects on late-successional habitat. Non-silvicultural activities within late-successional reserves are allowed where such activities are neutral or beneficial to the creation and maintenance of late-successional habitat. Thinning or other silvicultural activities must be reviewed by the Regional Ecosystem Office and the Regional Interagency Executive Committee.

Adaptive Management Areas: Where congressionally reserved areas or late-successional reserves occur within adaptive management areas, the amended plans will apply the more restrictive standards and guidelines of the congressionally reserved areas or late-successional reserves; however, within the Finney and Northern Coast Range AMAs, the late-successional reserve designations may be changed by AMA plans. Standards and guidelines for riparian reserves and key watersheds in adaptive management areas may allow more flexibility. AMA planning groups will closely coordinate with the Regional Ecosystem Office.

Managed Late-Successional Areas: Managed owl pair areas are typically on the east side of the Cascade Range. Suitable owl habitat in areas surrounding owl activity centers will be maintained through time using various management

techniques. The location of this acreage may change over time. Protocols will be developed for the location of special protection areas.

Administratively Withdrawn Areas: These areas have already been designated in existing plans. The amended plans will apply the most restrictive applicable standards and guidelines, whether from Attachment A or from existing plans.

Aquatic Conservation Strategy: The aquatic conservation strategy contains four components: riparian reserves; key watersheds; watershed analysis; and watershed restoration. Each part is expected to play an important role in improving the health of the region's aquatic ecosystems.

1. Riparian Reserves: Attachment A designates initial reserve widths for protected riparian areas, as well as specific requirements for timber management, road construction and maintenance, grazing, recreation, minerals management, fire/fuels management, research, and restoration activities. Initial boundary widths for riparian reserves are as follows:

- Fish-bearing streams - the area on each side of the stream equal to the height of two site-potential trees, or 300 feet slope distance, whichever is greater;

- Permanently flowing nonfish-bearing streams - the area on each side of the stream equal to the height of one site-potential tree, or 150 feet slope distance, whichever is greater;

- Lakes and natural ponds - the body of water and the area to the outer edges of riparian vegetation, or to a distance equal to the height of two site-potential trees, or 300 feet slope distance, whichever is greater;

- Constructed ponds and reservoirs and wetlands greater than one acre - the area from the edge of the wetland or the maximum pool elevation to a distance equal to the height of one site-potential tree, or 150 feet slope distance, whichever is greater;

- Seasonally flowing or intermittent streams -- the area on each side of the stream to a distance equal to the height of one site-potential tree or 100 feet slope distance, whichever is greater;

- Wetlands less than one acre and unstable and potentially unstable areas - the extent of unstable and potentially unstable areas, and wetlands less than one acre to the outer edges of the riparian vegetation.

Riparian reserve initial boundary widths established by this decision will remain in effect until they are modified following watershed analysis. Guidance on boundary modifications is contained in Attachment A.

2. Key Watersheds: We are designating three categories of watersheds:

- Tier 1 key watersheds -- those to be managed for at-risk anadromous salmonids, bull trout, and resident fish (141 watersheds, 8,119,400 acres);

- Tier 2 key watersheds -- those where high water quality is important (23 watersheds, 1,001,700 acres); and

- non-key watersheds -- all other watersheds (15,334,200 acres).

3. Watershed Analysis: Watershed analysis is a systematic procedure to characterize the aquatic, riparian, and terrestrial features within a watershed. Managers will use information gathered during watershed analyses to refine riparian reserve boundaries, prescribe land management activities including watershed restoration, and develop monitoring programs.

4. Watershed Restoration: Watershed restoration is designed to restore currently degraded habitat conditions. The most important components are control and restoration of road-related runoff and sediment production, restoration of riparian vegetation, and restoration of in-stream habitat complexity. Restoration programs will initially focus on arresting road-related erosion and silvicultural treatments in riparian reserves to restore large conifer canopies. In-stream restoration is inherently short-term and will be accompanied by upslope and riparian restoration to achieve long-term watershed restoration.

Matrix: Most of the timber harvest will occur on matrix lands. Standards and guidelines assure appropriate conservation of ecosystems as well as provide habitat for rare and lesser-known species. Some of the major standards and guidelines for matrix lands are:

- a renewable supply of large down logs must be in place;

- at least 15 percent of the green trees on each regeneration harvest unit located on National Forest land must be retained (except within the Oregon Coast Range and Olympic Peninsula provinces); and

- 100 acres of late-successional habitat around owl activity centers that were known as of January 1, 1994, must be protected.