order, preliminary injunction, or injunction pending appeal shall be issued by any court of the United States with respect to any decision to prepare, advertise, offer, award, or operate a salvage timber sale pursuant to subsection (b) or any decision to prepare, advertise, offer, award, or operate a timber sale pursuant to subsection (d). Section 705 of title 5, United States Code, shall not apply to any challenge to such a sale.

(4) STANDARD OF REVIEW.—The courts shall have authority to enjoin permanently, order modification of, or void an individual salvage timber sale if it is determined by a review of the record that the decision to prepare, advertise, offer, award, or operate such sale was arbitrary and capricious or otherwise not in accordance with applicable law (other than those laws specified in subsection (i)).

(5) TIME FOR DECISION.—Civil actions filed under this subsection shall be assigned for hearing at the earliest possible date. The court shall render its final decision relative to any challenge within 45 days from the date such challenge is brought, unless the court determines that a longer period of time is required to satisfy the requirement of the United States Constitution. In order to reach a decision within 45 days, the district court may assign all or part of any such case or cases to one or more Special Masters, for prompt review and recommendations to the court.

(6) PROCEDURES.—Notwithstanding any other provision of law, the court may set rules governing the procedures of any proceeding brought under this subsection which set page limits on briefs and time limits on filing briefs and motions and other actions which are shorter than the limits specified in the Federal rules of civil or appellate procedure.

(7) APPEAL.—Any appeal from the final decision of a district court in an action brought pursuant to this subsection shall be filed not later than 30 days after the date of decision.

(g) EXCLUSION OF CERTAIN FEDERAL LANDS.—

(1) EXCLUSION.—The Secretary concerned may not select, authorize, or undertake any salvage timber sale under subsection (b) with respect to lands described in paragraph (2).

(2) DESCRIPTION OF EXCLUDED LANDS.—The lands referred to in paragraph (1) are as follows:

(A) Any area on Federal lands included in the National Wilderness Preservation System.

(B) Any roadless area on Federal lands designated by Congress for wilderness study in Colorado or Montana.

(C) Any roadless area on Federal lands recommended by the Forest Service or Bureau of Land Management for wilderness designation in its most recent land management plan in effect as of the date of the enactment of this Act.

(D) Any area on Federal lands on which timber harvesting for any purpose is prohibited by statute.

(h) RULEMAKING.—The Secretary concerned is not required to issue formal rules under section 553 of title 5, United States Code, to implement this section or carry out the authorities provided by this section.

(i) EFFECT ON OTHER LAWS.—The documents and procedures required by this section for the preparation, advertisement, offering, awarding, and operation of any salvage timber sale subject to sub-

section (b) and any timber sale under subsection (d) shall be deemed to satisfy the requirements of the following applicable Federal laws (and regulations implementing such laws):

(1) The Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1600 et seq.).

(2) The Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.).

(3) The National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(4) The Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

(5) The National Forest Management Act of 1976 (16 U.S.C. 472a et seq.).

(6) The Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. 528 et seq.).

(7) Any compact, executive agreement, convention, treaty, and international agreement, and implementing legislation related thereto.

(8) All other applicable Federal environmental and natural resource laws.

(j) EXPIRATION DATE.—The authority provided by subsections (b) and (d) shall expire on December 31, 1996. The terms and conditions of this section shall continue in effect with respect to salvage timber sale contracts offered under subsection (b) and timber sale contracts offered under subsection (d) until the completion of performance of the contracts.

(k) AWARD AND RELEASE OF PREVIOUSLY OFFERED AND UNAWARDED TIMBER SALE CONTRACTS.—

(1) AWARD AND RELEASE REQUIRED.—Notwithstanding any other provision of law, within 45 days after the date of the enactment of this Act, the Secretary concerned shall act to award, release, and permit to be completed in fiscal years 1995 and 1996, with no change in originally advertised terms, volumes, and bid prices, all timber sale contracts offered or awarded before that date in any unit of the National Forest System or district of the Bureau of Land Management subject to section 318 of Public Law 101–121 (103 Stat. 745). The return of the bid bond of the high bidder shall not alter the responsibility of the Secretary concerned to comply with this paragraph.

(2) THREATENED OR ENDANGERED BIRD SPECIES.—No sale unit shall be released or completed under this subsection if any threatened or endangered bird species is known to be nesting within the acreage that is the subject of the sale unit.

(3) ALTERNATIVE OFFER IN CASE OF DELAY.—If for any reason a sale cannot be released and completed under the terms of this subsection within 45 days after the date of the enactment of this Act, the Secretary concerned shall provide the purchaser an equal volume of timber, of like kind and value, which shall be subject to the terms of the original contract and shall not count against current allowable sale quantities.

(l) EFFECT ON PLANS, POLICIES, AND ACTIVITIES.—Compliance with this section shall not require or permit any administrative action, including revisions, amendment, consultation, supplementation, or other action, in or for any land management plan, standard, guideline, policy, regional guide, or multiforest plan because of implementation or impacts, site-specific or cumulative,

of activities authorized or required by this section, except that any such administrative action with respect to salvage timber sales is permitted to the extent necessary, at the sole discretion of the Secretary concerned, to meet the salvage timber sale goal specified in subsection (b)(1) of this section or to reflect the effects of the salvage program. The Secretary concerned shall not rely on salvage timber sales as the basis for administrative action limiting other multiple use activities nor be required to offer a particular salvage timber sale. No project decision shall be required to be halted or delayed by such documents or guidance, implementation, or impacts.

SEC. 2002. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

DOWNWARD ADJUSTMENTS IN DISCRETIONARY SPENDING LIMITS

SEC. 2003. Upon the enactment of this Act, the Director of the Office of Management and Budget shall make downward adjustments in the discretionary spending limits (new budget authority and outlays) specified in section 601(a)(2) of the Congressional Budget Act of 1974 for each of the fiscal years 1995 through 1998 by the aggregate amount of estimated reductions in new budget authority and outlays for discretionary programs resulting from the provisions of this Act (other than emergency appropriations) for such fiscal year, as calculated by the Director. 2 USC 665 note.

PROHIBITION ON USE OF SAVINGS TO OFFSET DEFICIT INCREASES RESULTING FROM DIRECT SPENDING OR RECEIPTS LEGISLATION

SEC. 2004. Reductions in outlays, and reductions in the discretionary spending limits specified in section 601(a)(2) of the Congressional Budget Act of 1974, resulting from the enactment of this Act shall not be taken into account for purposes of section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985.

SEC. 2005. July 27 of each year until the year 2003 is designated as "National Korean War Veterans Armistice Day", and the President is authorized and requested to issue a proclamation calling upon the people of the United States to observe such day with appropriate ceremonies and activities, and to urge the departments and agencies of the United States and interested organizations, groups, and individuals to fly the American flag at half staff on July 27 of each year until the year 2003 in honor of the Americans who died as a result of their service in Korea. 36 USC 169m.

DENIAL OF USE OF FUNDS FOR INDIVIDUALS NOT LAWFULLY WITHIN THE UNITED STATES

SEC. 2006. (a) IN GENERAL.—None of the funds made available in this Act may be used to provide any direct benefit or assistance to any individual in the United States when it is made known to the Federal entity or official to which the funds are made available that—

(1) the individual is not lawfully within the United States; and

(2) the benefit or assistance to be provided is other than search and rescue; emergency medical care; emergency mass care; emergency shelter; clearance of roads and construction

ties damaged by the explosion in the same manner as private nonprofit facilities providing public services: *Provided further,* That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## INDEPENDENT AGENCIES

### FEDERAL EMERGENCY MANAGEMENT AGENCY

#### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $3,523,000, to increase Federal, State and local preparedness for mitigating and responding to the consequences of terrorism: *Provided,* That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### EMERGENCY MANAGEMENT PLANNING AND ASSISTANCE

For an additional amount for "Emergency Management Planning and Assistance", $3,477,000, to increase Federal, State and local preparedness for mitigating and responding to the consequences of terrorism: *Provided,* That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

This Act may be cited as the "Emergency Supplemental Appropriations for Additional Disaster Assistance, for Anti-terrorism Initiatives, for Assistance in the Recovery from the Tragedy that Occurred at Oklahoma City, and Rescissions Act, 1995".

Approved July 27, 1995.

---

LEGISLATIVE HISTORY—H.R. 1944:

CONGRESSIONAL RECORD, Vol. 141 (1995):
- June 29, considered and passed House.
- June 30, July 20, 21, considered and passed Senate.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 31 (1995):
- July 27, Presidential remarks.
- July 28, Presidential statement.

○

104TH CONGRESS 1st Session } HOUSE OF REPRESENTATIVES { REPORT 104–124

# MAKING EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR ADDITIONAL DISASTER ASSISTANCE AND MAKING RESCISSIONS FOR THE FISCAL YEAR ENDING SEPTEMBER 30, 1995, AND FOR OTHER PURPOSES

MAY 16, 1995.—Ordered to be printed

Mr. LIVINGSTON, from the committee of conference, submitted the following

## CONFERENCE REPORT

[To accompany H.R. 1158]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 1158) "making emergency supplemental appropriations for additional disaster assistance and making rescissions for the fiscal year ending September 30, 1995, and for other purposes," having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate, and agree to the same with an amendment, as follows:

In lieu of the matter stricken and inserted by said amendment, insert:

*That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, to provide emergency supplemental appropriations for additional disaster assistance, for antiterrorism initiatives, for assistance in the recovery from the tragedy that occurred at Oklahoma City, and making rescissions for the fiscal year ending September 30, 1995, and for other purposes, namely:*

90–739

among the completed combined documents to determine how sales should go forward.

The bill language provides a process for judicial review of emergency salvage sales by the Federal District Courts. The managers provided this mechanism for legitimate concerns with agency actions. Automatic stays for 45 days are required pending the final decision on review of the record by the district court within that time period. Due to the exigency of the emergency salvage situation administrative appeals are waived.

For emergency timber salvage sales, Option 9, and sales in Section 318 areas, the bill contains language which deems sufficient the documentation on which the sales are based, and significantly expedites legal actions and virtually eliminates dilatory legal challenges. Environmental documentation, analysis, testimony, and studies concerning each of these areas are exhaustive and the sufficiency language is provided so that sales can proceed.

The managers are aware of the high cost, time, and personnel commitment needed to mark salvage trees individually. The managers also recognize the requirement for federal agencies to designate timber authorized for cutting. Federal agencies are directed to determine the extent to which the use of designation by description is practical and are further directed to use the most effective method of designation to prepare salvage timber sales.

The emergency salvage provision clearly prohibits harvesting in National Wilderness Preservation System lands, roadless areas designated by Congress for wilderness study, and roadless areas recommended for wilderness designation in the most recent land management plan. Lands not specifically protected by the provision include prohibitions such as agency initiatives, timber sale screens, interim guidelines, settlement agreements, the CASPO Report, riparian areas covered by other initiatives, and any other area where the agencies restrict timber harvesting on their own accord.

The bill also allows all salvage sales proposals in development on the date of enactment of this Act to be immediately brought into conformity with this, the emergency salvage provision.

*Reporting*

The bill language directs the agencies to prepare a report by August 30, 1995, detailing the steps the agency is taking, and intends to take, to meet salvage timber sale volumes. The report shall also include a statement of the intention of the Secretary concerned with respect to the salvage volumes specified herein.

The managers will carefully review the Administration's implementation of the salvage program, and, if found to be inadequate, will employ such actions as deemed necessary. Such actions might include, but are not limited to, reallocation within budget categories or other prioritizations to be determined by the Congress.

*Option 9*

The managers have retained bill language added by the Senate that provides the Forest Service and Bureau of Land Management the authority to expedite timber sales allowed under the President's forest plan for the Pacific Northwest, commonly known as

option 9. The managers are concerned that the administration has not made the necessary efforts to fulfill the commitment it made to the people of the region to achieve an annual harvest level of 1.1 billion board feet and have included bill language to assist the administration in this effort.

On December 21, 1994, the Federal District Court issued an opinion upholding option 9 as valid under all present environmental laws. The managers wish to make clear that the bill language does not independently validate option 9 and does not restrict pending or future challenges.

The managers have added bill language to eliminate the need for an additional environmental impact statement in order to speed up the issuance of a final 4(d) rule, which will provide expedited relief to thousands of nonfederal landowners in the region. The managers understand that the Secretary of the Interior is extending the comment period on the proposed Section 4(d) rule, and expect the Secretary to review carefully the extensive Special Emphasis Areas in Washington to assure regulatory relief for nonfederal lands, particularly in light of new owl population data on the Olympic Peninsula. As provided in bill language, the managers have agreed that no environmental impact statement will be required for the Section 4(d) rule notwithstanding the outcome of pending litigation over Option 9. Finally, nothing in this provision is intended to prejudice the outcome of pending litigation over Endangered Species Act Section 9 prohibitions.

### *Released Timber Sales*

The bill releases all timber sales which were offered for sale beginning in fiscal year 1990 to the date of enactment which are located in any unit of the National Forest System or District of the Bureau of Land Management within the geographic area encompassed by Section 318 of the Fiscal Year 1990 Interior and Related Agencies Appropriations Act. Included are all sales offered, awarded, or unawarded, whether or not bids have subsequently been rejected by the offering agency, with no change in original terms, volumes, or bid prices. The sales will go forward regardless of whether the bid bond from the high bidder has been returned, provided it is resubmitted before the harvesting begins. The harvest of many of these sales was assumed under the President's Pacific Northwest forest plan, but their release has been held up in part by extended subsequent review by the U.S. Fish and Wildlife Service. The only limitation on release of these sales is in the case of any threatened or endangered bird species with a known nesting site in a sale unit. In this case, the Secretary must provide a substitute volume under the terms of subsection (k)(3).

### FUNDS AVAILABILITY

The conference agreement retains a Senate provision (section 2002) restricting funds availability to the current fiscal year unless otherwise stated. The House bill contained no similar provision.

United States Department of Agriculture | Forest Service | UMPQUA NATIONAL FOREST | 2900 Stewart Parkway Roseburg, Or. 97470 541 672-6601

File Code 1920

May 16, 1996

Dear Interested Party,

The North Umpqua Ranger District of the Umpqua National Forest has completed the Environmental Analysis for the Whitecap Timber Sale, located in Douglas County T27S., R1W., Sections 17, 18, 19, 20, 21, 28, 29, and 30 (Willamette Meridian). A copy of the Environmental Analysis is available for public review and comment.

The analysis includes four alternatives ranging from no harvest to harvest of 9.1 million board feet in the Little River Adaptive Management Area. The Forest Service proposes Alternative 2 which would harvest 9.1 million board feet using a combination of commercial thinning, thinning with group openings, and clearcut harvest. In addition to use of the existing transportation system, .6 miles of temporary road will be constructed. Alternative 2 would be modified by dropping the number of acres in small clearcuts from 75 down to 59 for the soil de-compaction study. The purpose of this letter is to provide you an opportunity to comment on this proposal prior to my final decision.

Written or oral comments will be accepted for 30 days following publication of this notice in the News Review. The Comment period ends June ??, 1996. It is ɿhe responsibility of persons providing comments to submit them by the close of .he comment period. Persons providing comments should provide the following information:

1) Specific facts or comments along with supporting reasons that you believe the Responsible Official should consider in reaching a decision.

2) The title of the document for which comments are being submitted; and

3) Your name and address

Comments should be addressed to Don Ostby, Forest Supervisor, Umpqua National Forest, PO Box 1008 Roseburg, Or. 97470. (541) 672-6601. Both Oral and written comments will be accepted. Additional information can be obtained from Dick Henbest, project coordinator, North Umpqua Ranger District--(541) 496-3532. Substantive comments will be addressed in an appendix to the Environmental Assessment. A legal decision will then be issued and published in the Roseburg News Review. The Whitecap Timber Sale is subject to Public Law 104-19 (1995 Rescission Act). This means that the decision for this project cannot be appealed.

Sincerely,

Don Ostby
Forest Supervisor

DECISION NOTICE
and
FINDING OF NO SIGNIFICANT IMPACT

**Whitecap Timber Sale**

Douglas County, Oregon
USDA - Forest Service
Umpqua National Forest
North Umpqua Ranger District

The Whitecap Timber Sale Environmental Assessment (EA) documents a "No-Action" Alternative, a Proposed Action, and three alternatives to the proposed action. Based on the analysis of how each alternative responds to the issues raised during scoping and the public comments received during the 30-day Notice and Comment period, I have decided to implement **Alternative 2** as described in the Alternatives Considered Section of the EA, with two modifications: First, Ten (10) small clearcuts, as illustrated on the map titled "WHITECAP TIMBER SALE - ALTERNATIVE 2 (MOD)", will be harvested instead of the 15 clearcuts shown for Alternative 2 in Section II of the EA. This will reduce the number of acres of clearcuts for the soil de-compaction study from 75 to approximately 59. Second, the fuels reduction, as described in Alternative 4, will be implemented with tree tops from harvested trees left on the site within riparian reserves and removed elsewhere within the thinning units. This decision includes implementation of the applicable mitigation measures, management requirements, and monitoring requirements described in the Alternatives Considered Section.

Alternative 2 (as modified) harvests an estimated 9.1 million board feet of timber from approximately 1,130 acres of land located in the Little River Adaptive Management Area (AMA). Harvest treatments consist of two types of thinning treatments, and ten 5 to 7 acre clearcuts totaling approximately 59 acres. Harvest will be done using a combination of tractor, multispan skyline, skyline, and helicopter. This decision also includes tree planting in the clearcuts, the construction of 0.8 miles of temporary road, storm-proofing (culvert replacement and installation) approximately to 16.1 miles of existing roads, decommissioning of 1.1 miles of existing road, the de-compaction of previously compacted soils in approximately 30 acres, the placement of large wood into an estimated 1.5 miles of fish bearing streams, and slash disposal to lessen fuel loads and risk of fire.

The Umpqua National Forest Land and Resource Management Plan (LRMP), as amended, is the principle policy under which this action was developed. As stated in the amended plan, the emphasis for the Little River Adaptive Management Area is the development and testing of approaches to integration of intensive timber production with restoration and maintenance of high quality riparian habitat. This planning area was identified as interior forest habitat during the Little River Watershed Analysis and was recommended for thinning to advance the development of old-growth habitat in both upland and riparian locations. The analysis of the proposal was conducted in accordance with the National Environmental Policy Act and the implementing regulations at 40 CFR 1508. The issues influencing this decision are described in detail in the EA. Those issues were the basis for the development of alternatives to the proposed action.

The Alternatives Considered section of the EA includes a description of the other four alternatives considered in detail. The following summary discloses why those alternatives were not selected.

Alternative 1: This alternative, the no-action alternative, was not selected because no adaptive learning would occur, tree growth and forest structural development would remain slow, and no funding would be generated for storm-proofing roads and other watershed rehabilitation.

Alternative 3: This alternative was developed to address a public concern for harvest within riparian reserves. Under this alternative, no treatment would occur within 360 feet either side of fish bearing streams and 180 feet either side of non-fish bearing streams. All other adaptive learning opportunities and watershed rehabilitation would remain the same as Alternative 2.

This alternative was not selected because it would not as directly or rapidly meet the objective of restoring riparian functions. Alternative 3 also would not facilitate learning from a comparison between riparian silviculture and no treatment in riparian areas. Development of approaches to riparian silviculture is an objective consistent with the Little River emphasis in the ROD, and it was a recommendation in the Little River Watershed Analysis.

Alternative 4: This alternative was created to lessen cumulative watershed effects associated with roads, to improve site productivity, and to lessen fragmentation of interior forest habitat. Alternative 4 differs from Alternative 2 in that the mileage of constructed or re-constructed roads is decreased by 1/2 mile resulting in an increase in aerial logging systems and overall logging costs. Fewer temporary roads would be constructed and more roads would be decommissioned. The slash treatment is different than in Alternative 2 because tree tops from harvested trees would be left on-site, within riparian reserves, where it would be available for nitrogen cycling and rehabilitation of site productivity. Fewer soil de-compaction clearcuts would be implemented and the location of the openings would be located to lessen the inducement of interior forest fragmentation. All adaptive learning opportunities would remain the same as Alternative 2. Watershed rehabilitation options are maximized under Alternative 4.

This alternative was not selected because the high logging costs of additional helicopter logging may cause the cost of such activities to exceed the revenues derived. Moreover, the amount of KV funds available for watershed rehabilitation projects may be limited or unavailable due to high logging costs. These economic concerns are not off-set by the small difference in additional road construction in Alternative 2.

Alternative 5: This alternative differs from Alternative 4 in that the clearcuts associated with the soil de-compaction study were dropped to eliminate the introduction of any new fragmentation. This alternative would generate 7.7 million board feet from 1,130 acres. With the exception of the de-compaction study and treatment, all learning opportunities would be the same as Alternative 2 and the watershed rehabilitation options would be the same as Alternative 4.

This alternative was not selected because high logging costs of additional helicopter logging may cause the cost of such activities to exceed the revenues derived. Also, the amount of KV funds available for watershed restoration

projects may be limited or unavailable due to high logging costs. These economic concerns are not off-set by the small difference in additional road construction in Alternative 2. Moreover, I did not select this alternative because I believe the soil de-compaction study is an important learning opportunity. Given that there are many acres of compacted soils in the watershed where site productivity is lowered, I feel this study is an important example of adaptive management that has application to other west-side forest lands.

Internal and external scoping was conducted as part of the analysis process. The public was first notified of the Forest's intent to assess this project through the October, 1995, Schedule of Proposed Actions, and the North Umpqua Ranger District NEPA Update. Quarterly notices regarding the progress of this project have been available since October of 1995. Public input was received in response to the scoping effort and this input was considered during the analysis process.

This project has undergone formal consultation with the U.S. Fish and Wildlife Service (USFWS) over effects to the Northern spotted owl. The U.S. Fish and Wildlife Service has issued a Biological Opinion and this sale follows the measures contained in that Opinion. The National Marine Fisheries Service (NMFS) is in concurrence with the finding in the biological evaluation for Umpqua cutthroat trout. No jeopardy exists with this sale and no conferencing was requested by NMFS.

Based on the documentation in Whitecap Timber Sale EA, I have determined the following with regard to the intensity of this project:

1. Considering the remoteness of the project in relation to local and regional population centers, and the mitigation measures governing the proposal, the likelihood of the project affecting the public's health and safety is indirect, remote and speculative.

2. The Cultural Resources Report and the Wildlife and Fisheries Report, located in the Analysis File section of the Whitecap EA, provide sufficient information to determine that this timber sale will not affect any known unique characteristics of the geographic area such as cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

3. The scoping performed during the analysis of this action and the content of the public responses received during the Notice and Comment period indicates some individuals are concerned with the effects on the quality of the human environment from thinning trees on 1,130 acres of land. I find that this degree of controversy does not satisfy the threshold for the preparation of an EIS.

4. The advertisement, auction, and award of a timber sale contract allowing for the silvicultural treatment of 1,130 acres of land administered by the National Forest is a practice that has occurred for more than four decades on the Umpqua National Forest. The management requirements and mitigation measures attached to Alternative 2 indicate this action is certain and does not involve unique or unknown risks.

5. The advertisement, auction, and award of a timber sale contract allowing the harvest of trees from 1,130 acres of National Forest land is a well-established practice and does not establish a precedent for future actions.

6. The cumulative impacts of harvesting trees under Alternative 2 are described on pages 16-20 of the Whitecap EA. I have reviewed the impacts of those past, present, and reasonably foreseeable actions described in the Environmental Effects Section of the EA and I find that this action will not have a cumulatively significant impact on the environment.

7. The Cultural Resources Report contained in the Analysis File section of the Whitecap EA indicates this action will not adversely affect any sites, structures, or objects listed in or eligible for listing in the National Register of Historic Places.

8. The Whitecap Biological Assessment (BA) determined that this action may affect, not likely to adversely affect, the Northern Spotted Owl. Some of the stands to be thinned fall within critical habitat for the Northern Spotted Owl. Through informal consultation, the U.S. Fish and Wildlife Service concurred with the finding in the BA. No take statement was issued and no mandatory measures were imposed for Whitecap. The Umpqua cutthroat trout is proposed for listing under the Endangered Species Act and the determination for this species in the BA was may affect, likely to adversely affect. No critical habitat has been established. The National Marine Fisheries Service has concurred with the Biological Assessment for Umpqua cutthroat trout. This timber sale will not jeopardize the continued existence of the species and no further conference was requested by the National Marine Fisheries Service.

9. Laws imposed for the protection of the environment provided the framework for the 1990 Umpqua National Forest Land and Resource Management Plan (LRMP). From the documentation provided in the Whitecap EA and Analysis File, I find that the harvest of 9.1 million board feet of timber from the Little River Adaptive Management Area does not threaten a violation of Federal, State, or local law imposed for the protection of the environment.

From the preceding, I find that the Whitecap Timber Sale does not constitute a major Federal action that would significantly affect the quality of the human environment. Therefore, an Environmental Impact Statement is not necessary. In accordance with the National Forest Management Act and other applicable laws, I also find the following:

The project is consistent with the goals and objectives of the Umpqua National Forest Land and Resource Management Plan, as amended, and will help achieve the desired future condition of the Umpqua National Forest.

No timber will be sold from lands not suitable for timber production (see 36 CFR 219.14 for definition).

All vegetation manipulation in the project area will comply with the requirement of 36 CFR 219.27(b).

In accordance with 36 CFR 215.5, notice of the opportunity to comment on the Whitecap Timber Sale EA was published in the Roseburg News Review on May 15, 1996. Also, the Environmental Assessment was mailed to those who requested notice and to those who were involved in the scoping process. Having received one written comment, implementation of this decision shall occur in accordance with CFR 36 215.10.

This decision for the Whitecap Timber Sale is located on lands covered by Option 9 of the "Record of Decision for Amendment to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl." Under the provisions of subsection 2001(e) of Public Law 104-19, this decision is not subject to appeal as described in regulations at 36 CFR 215.

This decision is subject to judicial review only in the United States district court for the district in which the affected Federal lands are located. As required under Section 2001(f)(1) of Public Law 104-19, any challenge to this project must be filed in the district court within 15 days after advertisement of the sale.

For further information, contact Don Ostby, Forest Supervisor, Umpqua National Forest, P.O. Box 1008, Roseburg, Oregon, 97470, (541) 672-6601.

For Bernie Rios
DON OSTBY
Forest Supervisor

6/28/96
Date

7/2/96
Date Published